# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person*<br>*by name and address)*<br><br>**2650 Lawrence Court, Lafayette, CO 80026**, more<br>fully described in Attachment A, attached hereto, to<br>include all out-buildings and vehicles located thereon<br>and to include the person of Matthew B. Goettsche at the<br>time of the search warrant execution; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No.   19-sw-6249-STV |

## APPLICATION FOR A SEARCH WARRANT

I, Roger Duh, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the <u>State and District of Colorado</u> *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    X  evidence of a crime;

    X  contraband, fruits of crime, or other items illegally possessed;

    X  property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of 18 U.S.C. §§ 371, 1343, 1348, 1349, 1956, and 1957 and 15 U.S.C. §§ 77e, 78j(b), and 77x, and the application is based on these facts:

    X  Continued on the attached affidavit, which is incorporated by reference.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
        under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Roger Duh*
_____
*Applicant's signature*

Roger Duh, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and:   ☐ signed in my presence.
                          ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   December 6, 2019
     _____
_____
*Judge's signature*

City and state:   Denver, Colorado
                                    Scott T. Varholak, U.S. Magistrate Judge
                                          *Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The Subject Premises is located at 2650 Lawrence Court, Lafayette, CO 80026.  The Subject Premises is more particularly identified as a two-story, single family residence at the end of a cul-de-sac. A long driveway curves around to the right on its approach to the home. At the entry to the driveway from the public road are stone wall structures. The stone structure on the left side of the driveway entry contains a mailbox. A large grass yard lies between the public road and the structure. On the right are two two-car garages; the main part of the residence is to the left of the garages.  A fountain with a large round stone sits in front of the leftmost garage. The entry door to the residence appears to be located to the left of the garage.  The location consists of the subject residence, surrounding property, and all outbuildings located thereon.  The place to be searched includes the person of Matthew B. Goettsche at the time of the search warrant execution.  Photographs of the subject premises are located below:



1



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located within the residence at 2650 Lawrence Court, Lafayette, CO 80026 that constitute evidence of the commission of the offenses, contraband, the fruits of crime, or instrumentalities of violations of 18 U.S.C. §§ 371, 1343, 1348, 1349, 1956, and 1957 and 15 U.S.C. §§ 77e, 78j(b), and 77x (hereinafter "Subject Offenses"), including the following:

1. Records, communications, and other information relating to the following:

    a. The establishment, operation, ownership, control, management, computer infrastructure, and/or any other aspect of a business entity known as or referred to as the BitClub Network, any similarly named entity or enterprise, or any other entity or enterprise involved in pooled cryptocurrency mining;

    b. The establishment, operation, or use of any entity or law firm used to receive, handle, distribute, divert, and/or transfer funds related to or derived from the Subject Offenses or to purchase or transfer assets, real property or otherwise, using funds derived from the Subject Offenses.

    c. The receipt, transfer, transmission, handling, distribution, diversion, exchange, mining, and/or use of any cryptocurrency, cash, or wire exchanges;

    d. Any advertisement, solicitation, marketing, request, and/or invitation regarding any pooled investment and/or multi-level marketing entity or enterprise;

    e. The locations of coconspirators, servers, accounts, online storage, hosting, equipment, mining centers, or other sources of information involving the Bitclub Network.

    f. The BitClub Network, including, but not limited to, investments, potential investments, redemptions, accounts, accounting, shares, commissions, networking opportunities, meetings, contracts, and investor inquiries;

    g. Bitmain, Bitfury, Genesis Mining, Cryptowatt, Dan Burrell, Kevin Washington, Keri Vanvalkenburgh, and any other entity or person involved in bitcoin mining, bitcoin equipment, or the leasing of space for bitcoin mining;

    h. The use, receipt, handling, distribution, diversion, and/or transfer of funds related to or derived from the Subject Offenses;

    i. The use, opening, and/or closing of bitcoin exchanges, tumblers, bank accounts and cryptocurrency wallets and accounts, and any deposits, withdrawals, wire transfers, exchanges, and any other transactions involving such bank accounts or wallets, that were used to further the commission of the Subject Offenses;

      j.   Goettsche's travel and/or travel of any of his coconspirators, including travel by way of private aircraft; and

2.   Bank statements, bank checks, cash receipts, money transfer records and receipts, money remittance instructions, customer information and records, sales records, ledgers showing cash and checks received, contracts, fax records, correspondence, including but not limited to correspondence with others regarding the transmission of money, printed emails, letters, faxes, and telephone logs or messages, for both domestic and foreign bank accounts and exchanges including, but not limited to, Commerzbank, OSL, Bank of Nevis, Banco De Costa Rica, Atlantic Bank Ltd., Bitfinex, RBC Capital Markets, Binary Trading, Binary FZE, Trilix PTE, Lantau Peak Trading, and Sackville Bank and Trust;

3.   Records and communications relating to real property holdings, including but not limited to Hatchet Caye Island and Hatchet Caye Resort, Casa Colonial in Costa Rica, and any property in St. Kitts;

4.   Address and/or telephone books, Rolodex indices, invoices, communications, and any papers or records reflecting names, addresses, email addresses, telephone numbers, pager numbers, facsimile numbers and/or telex numbers of co-conspirators, financial institutions, and other individuals or businesses with whom a business or financial relationship exists;

5.   Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

6.   United States currency in amounts exceeding $1,000;

7.   Proceeds and property related to the Subject Offenses, including any and all cryptocurrency, to include the following:

      a.   any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

      b.   any and all representations of cryptocurrency private keys, whether in electronic or physical format;

      c.   any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet;

      d.   The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States;

8.  Cellular telephones (including searching the memory thereof) and used to generate, transfer, count, record and/or store the information and evidence described in this Attachment;

9.  Photographs, records, and documents, including still photographs, negatives, video tapes, films, undeveloped film and the contents therein, slides, and any video, recording or photographic equipment containing the aforementioned items, containing information regarding the identities of coconspirators or those involved in the Subject Offenses;

10. Indicia of occupancy, residency, ownership and/or use of the subject premises, including but not limited to, utility and telephone bills; canceled envelopes; rental, purchase or lease agreements; and keys;

11. Reports, records or any other document or item relating or referring to official or unofficial law enforcement activities and investigations;

12. Articles of Incorporation, corporate resolutions, corporate minute books, corporate stock books, corporate stock certificates, corporate state charters, records of corporate franchise taxes paid, corporate financial statements, profit and loss statements, balance sheets, and statements of cash flow;

13. General journals, cash receipt journals, cash disbursement journals, sales journals and computer printout sheets;

14. General ledgers and subsidiary ledgers including notes receivables, accounts receivables, accounts payable, notes payable, adjusting journals and closing ledgers;

15. Receipts and invoices for all expenditures;

16. All Federal income tax returns, Forms 1040, W-2, 1099, 1120, 940, 941, K-1 , or copies of same and supporting work papers, summary sheets, and analyses used in the preparation of the tax returns;

17. All personal financial statements, contact bids, proposals, closing statements, warranty deeds of trust, release deeds, or other documentation supporting conveyances and/or ownership of properties, and vehicle registration and titles;

18. Safes, key-lock strong boxes, suitcases, locked cabinets, and other types of locked or closed containers used to secrete and store currency, books, records, documents, financial instruments, and other items of the sort described above.  Law enforcement officers executing this Warrant are specifically authorized to open any such locked safes or containers including, where necessary, by using force;

19. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications devices, cellular

3

telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Subject Offenses.

20. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant relating to the Subject Offenses:

a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

g. records of or information about Internet Protocol addresses used by the COMPUTER;

h. information about usernames or any online accounts or email addresses;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. contextual information necessary to understand the evidence described in this attachment;

l.   volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

m.   any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offenses;

n.   items otherwise described above in paragraphs 1(a-h) of this Attachment B.

Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of Matthew B. Goettsche onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device.  Law enforcement personnel may also hold the device(s) found at the Subject Premises in front of the face of Goettsche to activate the facial recognition feature; and/or (3) hold the device(s) found at the Subject Premises in front of the face of Goettsche to activate the iris recognition feature, for the purpose of unlocking the device(s) in order to search the contents as authorized by this warrant.

DEFINITIONS:

21. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

22. As used above, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## AFFIDAVIT

I, Special Agent Roger Duh, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.  I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed for approximately eight years and eleven months.  I am currently assigned to the White Collar Crimes Unit, where I specialize in the investigation of white-collar crimes, including bank fraud, healthcare fraud, public corruption, and other types of complex financial crimes.  During my career as an FBI Special Agent, I have participated in numerous Counterintelligence investigations.  In addition, I have received both formal and informal training from the FBI and other entities regarding violations of various fraud statutes.

2.  This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter, the "Subject Premises,"), and computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371, 1343, 1348, 1349, 1956, and 1957 and 15 U.S.C. §§ 77e, 78j(b), and 77x (hereinafter "Subject Offenses").

3.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses are presently located at the Subject Premises.

4.  The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## TECHNICAL TERMS

5.  Based on my training and experience, I use the following technical terms to convey the following meanings:

A.    **Computer Terminology**

6.  "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet.  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

1

7. "Internet" means a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

8. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

**B.    Cryptocurrency**

9. "Cryptocurrency" is a digital representation of value that can be traded and functions as a medium of exchange; a unit of account; and a store of value, but does not have legal tender status in any jurisdiction. Cryptocurrency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the cryptocurrency.

10. Cryptocurrency is distinct from "fiat currency," which is the money designated by a country as its legal tender. The U.S. dollar is an example of a fiat currency. Cryptocurrencies may be traded on online exchanges for fiat currencies, including the U.S. dollar, or used to purchase goods and services.

**C.    Bitcoin**

11. Bitcoin is a type of cryptocurrency. Bitcoin are generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin exist primarily as units of an Internet-based form of currency.

12. Bitcoin are sent to and received from bitcoin "addresses." A bitcoin address is analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each bitcoin address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address. Only the holder of the private key to an address can authorize the transfer of bitcoin from that address to other bitcoin addresses.

13. Bitcoin are stored in and used from wallets. A wallet keeps the private key that allows an individual to transact in bitcoin from an address associated with the wallet. A wallet can be held online—which permits access from any web-enabled device—or on a device, such as a smart phone. A wallet can contain an unlimited number of addresses and enables the user to create new addresses, monitor the amount of bitcoin per address, and authorize transactions using the private key.

14. To transfer bitcoin to another address, the payor transmits a transaction announcement, cryptographically signed with the payor's private key, across the peer-to-peer bitcoin network. The bitcoin address of the receiving party and the sender's private key are the only pieces of information needed to complete the transaction. These two keys by themselves rarely reflect any identifying information. As a result, little-to-no personally identifiable information about the payor or payee is transmitted in a bitcoin transaction.

15. Once the payor's transaction announcement is verified, the transaction is added to the bitcoin "blockchain," a decentralized public ledger that records all bitcoin transactions. The blockchain logs every bitcoin address that has ever received a bitcoin and maintains records of every transaction for each bitcoin address. Bitcoin transactions can be done on many different digital devices, including laptops and smart phones.

16. To acquire bitcoin, a typical user will purchase them from a bitcoin "exchanger." Bitcoin exchangers generally accept payments of fiat currency or other convertible cryptocurrencies. The user typically sends funds to the exchanger, often via cash, bank wire or ACH, for the corresponding quantity of bitcoin, based on a fluctuating exchange rate. The exchanger, usually for a commission, then either sells the user bitcoin from the exchange's reserves or attempts to broker the purchase with another user who is trying to sell bitcoin. The purchased bitcoin are then transferred to the purchaser's bitcoin address.

17. From the start of 2014 to the present—roughly the timespan of the scheme under investigation—the exchange rate of United States dollars to bitcoins has fluctuated between a low of approximately $165 per bitcoin and a high of approximately $19,783 per bitcoin.

## D.    Cryptocurrency Mining

18. Bitcoin and some other cryptocurrencies can be "mined." A "miner" is an individual or entity that runs special computer software to solve complex algorithms that validate groups of transactions in a cryptocurrency.

19. The bitcoin protocol self-generates units of currency by awarding newly created coins to the first miners to solve the algorithms that validate bitcoin transactions. The bitcoin protocol collects all bitcoin transactions made during a set time period into a "block." Bitcoin miners compete to be the first to confirm the transactions in the block and write them into the blockchain, in effect, adding a new entry to the public ledger. The first miner to solve the algorithm is rewarded with a preset amount of newly-issued bitcoin by the bitcoin protocol. This process—solving equations to earn new coins—is known as "mining." At present, successful bitcoin miners are compensated at the rate of 12.5 bitcoin per block.

20. As interest in bitcoin and other cryptocurrencies and corresponding competition among miners has increased, additional computer processing power was required for a miner to solve the algorithms and harvest new currency. The processing power of computers used to confirm bitcoin transactions is measured by their "hash rate," or the number of calculations the computers can perform per second.

3

21. Bitcoin miners sometimes combine their computing power into mining "pools." As a general rule, the more computing power directed to a particular mining pool, the better the chance that the pool will succeed in being the first to confirm a block of transactions and obtain new bitcoin.

**E.     Anonymity and Transaction Tracing**

22. Cryptocurrencies, including bitcoin, have known legitimate uses. However, given the ease with which bitcoin can be used to move funds with high levels of anonymity, bitcoin can be used to facilitate illicit transactions and launder criminal proceeds.

23. Although the public addresses of those engaging in bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses typically are not recorded. In some instances, however, bitcoin payments may be traced to individuals that purposely or inadvertently reveal their public address or when they exchange bitcoin for fiat currency. Investigators can use analysis tools to follow the blockchain and associate groups of bitcoin addresses, known as "clusters." Investigators used such a proprietary tool[1] to identify bitcoin addresses that received investments and that received purported mining proceeds in this investigation described below.

24. Bitcoin users can use services, including those known as "mixers" or "tumblers," or other concealing methods called "peel chains" to process bitcoin transactions in a manner designed to frustrate the tracking of individual transactions through the blockchain. These mechanisms obscure links between the sending and receiving addresses, making it far more complicated to use the blockchain to follow the money trail involved in the transaction. Based on my training and experience, the act of mixing and tumbling cryptocurrency is often intentionally done to hide the flow of funds or launder criminal proceeds.

## SEIZURE AND SEARCH OF COMPUTERS

25. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises**,** there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

26. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and

---

[1] Law enforcement has used proprietary services offered by blockchain analysis companies to investigate bitcoin and other cryptocurrency transactions. Through numerous unrelated investigations, the tool provided by the company here has been found to be reliable.

virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

27. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

28. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

29. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

30. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software

5

(operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

31. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

32. Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

33. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

34. Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

35. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

36. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

37. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

    C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted

electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

38. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment.  This is true because of the following:

    A. The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

    B. The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    C. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

D. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

E. Need to review evidence over time and to maintain entirety of evidence.  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

39. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site  seizing, imaging and searching and off-site imaging and

searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

40. Execution of the requested search warrant may result in the seizure of materials that may involve an attorney or otherwise be subject to an applicable privilege. For that reason, an agent who is not otherwise working on this case (the "Filter Agent") will be present to collect and maintain those records, which will then go through an appropriate filter review process to maintain any applicable privilege. Grimmer and Associates and Beverly Hills Law Corp. are law firms that are believed to be associated with the entities or individuals under investigation.

41. Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

42. Your Affiant knows from training and experience that digital storage devices, including cryptocurrency storage devices, can be very large in capacity, yet very small in physical size. Additionally, your Affiant knows from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

43. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

44. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the

device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require.

45. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode.  Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone.  If the operating system is version 9.3 or later, that time frame shrinks to 8 hours.

46. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful.  For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the Subject Premises while executing the search warrant.  The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button.  Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

47. In addition, I know in my training and experience that many other mobile device manufactures have their own version of Touch ID—that is, a fingerprint recognition feature that the device's user can program and use to unlock the device.  For instance, I know that Google Pixel phones and Google Pixel XL phones have a fingerprint sensor that can be used to unlock the device.  Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors.

48. Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint.  Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

49. Further, if a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing

camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

50. Similarly, if a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

51. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

52. As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices, including several Apple devices ("the Device(s)"), will be found during the search. The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant

53. Due to the foregoing, I am informing the Court that if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, law enforcement personnel intends to obtain from Matthew B. Goettsche the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of Goettsche to the fingerprint scanner of the Device(s) found at the Subject Premises; (2) hold the Device(s) found at the Subject Premises in front of the face of Goettsche to activate the facial recognition feature; and/or (3) hold the Device(s) found at the Subject Premises in front of the face of Goettsche to activate the iris recognition feature, for the purpose of unlocking the Device(s) in order to search the contents as authorized by this warrant.

54. Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to

establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, telephone bills, correspondence and other identification documents.

55. Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## **INVESTIGATION**

56. On December 5, 2019, a Federal Grand Jury in the District of New Jersey returned an Indictment under case number 19-cr-877, currently under seal, charging Wire Fraud Conspiracy (Count One) and Conspiracy to Promote and Unregistered Security (Count Two). Five subjects are named in this sealed indictment including Matthew B. Goettsche ("Goettsche"), Jobadiah Sinclair Weeks ("Weeks"), Russ A. Medlin ("Medlin"), and Catalin Balaci ("Balaci") (each charged in both Counts One and Two) and Joseph Abel ("Abel") (charged in Count Two). The Subject Premises for this search warrant is Goettsche's primary residence.

57. The BitClub Network ("BCN") purported to operate a cryptocurrency mine funded by and for the benefit of investors. BCN represented to prospective and current investors that invested funds were used to finance shares in cryptocurrency mining pools, with the resultant mining proceeds disbursed pro rata to investors. BCN also purported to reward existing investors for recruiting new investors.

58. BCN was founded in 2014, as evidenced by electronic communications obtained by search warrant among Goettsche, Russ A. Medlin, both creators and operators of BCN, and Silviu Catalin Balaci, a Romania-based computer programmer and operator of BCN.

59. A website maintained by BCN told investors that they could "earn passive income" through investment in what BCN purported were three bitcoin mining pools. Specifically, BCN represented:

> You can purchase a share in 3 different mining pools and all Bitcoin mined from each pool will be paid and shared with all members eligible for the pool. You pay either $500, $1,000, or $2,000 worth of Bitcoin for a share of the mining pool.
>
> With your purchase you will receive Bitcoin for 1,000 days! A percentage of all Bitcoin mined and paid to you will be used to pay for mining costs and to purchase new mining equipment.
>
> *No Sponsoring Required to Earn Mining Pool Payouts

13

60. BCN represented further how the investments in each of the pools would work:

>  Mining Pool #1 -- -- Each share cost $500 USD that will be used to purchase new Bitcoin mining servers. All Bitcoin earned will be split among all members of this pool and paid out daily. Each share earns 50% profit with the other 50% being used to fund the mining operation and to purchase additional mining shares.

>  Mining Pool # 2 -- Each share cost $1,000 USD and just like Pool #1 the total Bitcoin earned will be split among all members in the pool and paid out. Each share earns 60% profit with the other 40% being used to fund the mining operation and to purchase additional mining shares.

>  Mining Pool #3 – Each share cost $2,000 USD and the total Bitcoin earned will be split among all members in the pool and paid out. Each share earns 70% profit with the other 30% being used to fund the mining operation and to purchase additional mining shares

61. BCN additionally displayed on its website the following illustration of how BCN investors would earn profit from their investment in the shares of the purported bitcoin mining pools:

>  Example: Using Mine #1, if the total Bitcoin mined for the day = 1 BTC and there are 100 shares outstanding then each share would earn .01 BTC. From this total 50% of it would be paid directly to the member as profit (.005 BTC) and the other 50% (.005 BTC) would be used to fund the mining operation costs and to purchase additional shares.

>  So if the value of 1 Bitcoin = $500 and you have 1 share then you would earn $5 USD (.01 BTC) of which $2.50 is paid to you and $2.50 is used to purchase an additional share on your behalf.  In this case you would purchase an additional .005 shares with your $2.50 and you would have a total of 1.005 shares going into the next day that you are now earning on.

62. BCN further claimed through its website that it was not owned by any one person, but instead was:

>  a team of experts, entrepreneurs, professionals, network markers, and programming geeks who have all come together to launch a very simple business around a very complex industry. Anyone can join

BitClub and begin earning a passive income by taking advantage of
our expertise in Bitcoin mining and other Bitcoin related services.

63. Finally, on BCN's website, BCN stated that BCN "use[s] our leverage and massive
purchasing power to strategically buy mining hardware at the lowest prices and share in all
the profits produced."

64. Throughout the course of BCN's existence, BCN appears to have entered into or tried to
enter into agreements with third parties for mining equipment, space to mine bitcoin,
electricity, and other arrangements involving the mining of bitcoin on behalf or involving
BCN. It does not appear that the terms or expenses of these arrangements were disclosed to
BCN investors. For example:

A. On or about August 22, 2016, Goettsche emailed Weeks with the subject line "[t]he
plan to conquer bitcoin :)." In the body of the email, Goettsche wrote, "…btw 7 PH
bought from Bitmain $1,035,600…(about $147k/PH), and they are shipping us real
machines that we can plug into the wall and in case somethings (sic) happens we can
liquidate." Based on this investigation, I know PH to be a reference to "petahash." I
further believe this email to be Goettsche and Weeks discussing a deal struck between
BCN and Bitmain regarding the purchase of mining power from Bitmain.

B. On or about January 14, 2016, Weeks forwarded Goettsche an email with the subject
line "Joby and Bitfury Agreement." The body of the email is a series of
communications between Weeks and an individual associated with Bitfury USA, Inc.
("Bitfury") ("Individual 1"). Based on this investigation, I am aware that Bitfury is a
technology company that, among other things, provides cryptocurrency mining
hardware. In one such communication, Weeks told Individual 1, "just sent $1,000,000
from one wallet. [] Can you confirm you got that? [] Joby [.]" Individual 1 then
responded, "[c]onfirmed that we received 2314.86839973 BTC." Weeks then sends
the email to Goettsche. Based on this investigation, I believe that Weeks and
Individual 1 were discussing a payment made to Bitfury regarding a contract between
Bitfury and BCN.

C. In or around June 2015, Goettsche emailed a representative at Genesis Mining
regarding the possibility of entering into cloud mining contracts and arrangements for
bitcoin mining equipment.

D. In or around November 2018, Goettsche emailed with Kevin Washington, Dan
Burrell, and Kari Vanvalkenburgh about bitcoin mining involving an entity called
"CryptoWatt." In one email, Goettsche exclaims that "Bitcoin mining is in the toilet
and we are dangerously close to running the facility at a complete loss. I know you
think you are doing me a favor by taking a haircut on your equity buyout, but the
truth is I am saving your ass giving you anything out of this and probably going down
with ship."

65. Google chats obtained as part of the investigation between Goettsche, a veteran of multiple multi-level marketing entities, and Balaci revealed that BCN solicited early investment by "faking" mining—i.e., claiming that BCN operated a cryptocurrency mine when it in fact did not.  For example:

A.  On October 2, 2014, Goettsche and Balaci discussed falsifying the revenue numbers displayed to BCN investors:

| | |
|---|---|
| Goettsche: | but we may need to fake it for the first 30 days while we get going |
| Balaci: | sure |
| Balaci: | we can do that |
| Goettsche: | it needs to look real though ☺ |
| Goettsche: | so need a bit of your magic touch on it |
| Balaci: | look real how? We fake real revenue numbers and show them in account daily |
| Goettsche: | and we dont want to fake it too good so that when we need to back it down it drops off |
| Goettsche: | terminolgy |
| Goettsche: | explanation of what is happening |
| Goettsche: | inconsistent numbers daily so its not perfect |
| Goettsche: | all kinds of stuff |
| Balaci: | inconsistent numbers IS real |
| Goettsche: | people think we are not legit or are weary so we need to be careful rolling this out |
| Balaci: | if we pay consistent numbers it will be fake |
| Goettsche: | i know... thats what I am saying, make the numbers inconsistent |
| Balaci: | yeah |

16

Balaci:      will make it real

B.   In or around October 2014, Goettsche discussed with Balaci how they should calculate fake mining earnings for investors.  Balaci observed, "I guess most people do not know only 40% is used for mining and the rest for commissions," to which Goettsche replied, "the leaders know . . . its the sheep that don't."

C.   In or around January 2015, Goettsche discussed with Balaci that BCN should develop fake "proof" and "statistics" to display to potential BCN investors to promote investment in BCN:

Goettsche:      how can we get some shiny shit for members?

Goettsche:      oh also

Goettsche:      need to bump up the payout

Goettsche:      its really low

Balaci:      what shiny shit you want exactly?

Goettsche:      the stats you just showed me

…

Balaci:      ?? fake a pool

Balaci:      or:

Goettsche:      yea

Goettsche:      real stats on fake numbers

Goettsche:      we will slowly introduce real numbers

Balaci:      uhmmm ok, but to make it believable will not be easy

Balaci:      cause we need to code variance in

Balaci:      will try to get something up

Goettsche:      Im telling you man

Goettsche:      some stats like this

17

| | |
|---|---|
| Goettsche: | a picture with our banners |
| Goettsche: | and some proof in the blockchain |
| Goettsche: | and look this fuck out!! |
| Goettsche: | its over |

D. Approximately four months later, on or about February 2, 2015, Goettsche directed Balaci to "bump up the daily mining earnings starting today by 60%."  Balaci responded, "that is not sustainable, that is ponzi teritori (sic) and fast cash-out Ponzi."  Goettsche responded, "yeah they have not been bumped in a long time…we can push them back down, but we need a boost…we will dilute over time…members will think its due to strong growth…we need to look like we will break them even in 9-12 months[.]"

66. Goettsche discussed altering the figures displayed to investors as "mining earnings" beyond 2015.   On September 10, 2017, Goettsche sent an email to Medlin with the subject line "idea."  In the email, Goettsche proposed closing BCN's current mining "pools" and putting payments on "autopilot."  Goettsche further suggested as part of his "plan" that BCN "[d]rop mining earnings significantly starting now."  Medlin responded to Goettsche's email:  "I like it.  Call me when you can."

67. Based on my review of these and other communications, Goettsche, Balaci, and Medlin were discussing their ability to manipulate purported mining proceeds that they were reporting to investors in a manner intended to deceive investors and encourage new investment.  The above communications further show that BCN was able to control and manipulate the purported mining earnings in September 2017, approximately three years after BCN began operating.

68. There is further probable cause to believe that BCN manipulated the mining earnings of its investors.  BCN investors complained to BCN about such manipulation.

69. For example, on or about November 29, 2017, a BCN investor ("Investor-1") expressed his concern in a Facebook chat room of other BCN investors, including Weeks.  Investor-1 explained that he was worried about the mining share payments because he had two accounts and on the same date, from the same pool, he received two different amounts.  Specifically, his first account was started approximately 40 days earlier and was receiving less mining earnings than his account that started mining two days prior.  In other words, two accounts that should be receiving the same profit from the same pool reflected two different amounts of the purported bitcoin mining profits.  He explained further to the group that he had other BCN accounts and:  "all of them ha[ve] the same pattern first days pay way more then pays before start pay less is the same order, in the same days, in the same pool[.]"  Investor-1 continued:

> I have access to all the accounts of the people that I have referred to in bitclub and I have been carefully watching everything that happens in them, in each and every one of them there is a very strange pattern and it is that they all start earning a quantity of bitcoins around 0.00049 and as the days go by the number starts to go down. In each and every one of these accounts, the pattern is the same, no matter what day they started, which makes all this rare. I do not want to think badly but I can not think well about this that seems more like a mathematical exercise than an authentic mining.

70. Based on my review of these and other communications, there is probable cause to believe that the Subjects and their co-conspirators manipulated the value of the mining earnings reported to BCN investors, such as Investor-1 in a way to defraud its investors.

71. Throughout its existence, BCN also falsely represented to the public what its operators knew not to be true—that purely passive cryptocurrency mining was profitable.  Goettsche and Balaci discussed the unprofitability of passive mining at length during the early stages of BCN.  For example:

   A. On or about October 9, 2014, Balaci told Goettsche: "they are scams man, all cloud mining companies do not actually mine. Because it is not profitable to mine 😀 it is more profitable to say you mine and get money off suckers."

   B. On or about October 15, 2014, Goettsche told Balaci that he "was just hoping for some real ROI from mining but now we are just going to use it as a front until we can either afford to [] do it right or come up with something better."  The conversation continued:

   | | |
   |---|---|
   | Goettsche: | we just need to keep the networking growing 😀 |
   | Balaci: | well it will be like any other MLM so far... only people that refer other people will see profits |
   | Balaci: | or if they buy early shares and shares keep coming |
   | Balaci: | 😀 |
   | Goettsche: | yep |
   | Goettsche: | we will continue to prop it up |
   | Goettsche: | plenty of money will come rushing in |
   | Goettsche: | Im not worried about that |

    C.  On or about November 4, 2014, Balaci told Goettsche: "just so you know, this model is not sustainable at all . . . this is a PONZI." Goettsche replied, "this is how it starts," that, "eventually," the investors "will all just earn pennies," and that an investment based on mining would become "really unprofitable." But Goettsche said that they would "worry about that in the future." Balaci replied, "legally it is questionable . . . anyway your company."

72. Additionally, throughout the course of BCN, BCN has sold shares in its purported bitcoin mining pools that constitute "securities," but has not registered those securities with the U.S. Securities and Exchange Commission ("SEC").  On August 19, 2017, BCN prepared an investor alert in which it admitted that its "Bitcoin mining could potentially be a security or even lumped under the MSB [money service business] umbrella."

73. Notwithstanding that BCN's securities have not been registered with the SEC, Medlin, as well as BCN promoters Weeks, Abel, and others have, throughout the course of BCN, prepared several videos that have been posted onto the Internet that promote the sale of these unregistered securities in BCN.  Weeks and Abel have also utilized Facebook's messengering service to promote the sale of BCN securities.  For example, on or about January 7, 2018, Abel prepared a video in which he instructed how to access BCN's website from the United States.  On April 11, 2018, Weeks sent a Facebook message to a group of people and indicated that he was having a bitcoin event in Tampa, Florida.

74. The investigation to date has further revealed that Mike Goettsche ("Mike")—Goettsche's brother—is also involved in the BCN scheme described above.  According to chat records we have received, on or about September 16, 2014, Goettsche requested that Balaci set up three administrative accounts:  one for Goettsche, one for Medlin, and one for "Mike." Moreover, on or about December 20, 2017, Goettsche and Balaci emailed about the levels of administrative access certain administrators should have to BCN's system.  On the list, "Mike" is listed as having "god mode" access.

75. It appears that Mike, through the course of the scheme, handled customer complaints and performed other aspects of running BCN.  Later, on or about January 29, 2018, Goettsche and Balaci discussed who should be permitted to have full access to the historical records and logs of BCN.  In so doing, Goettsche mentioned, "mike is overloaded" with providing BCN customer support.  Balaci concluded that only Goettsche, Balaci, Medlin, and Mike should be able to see all of BCN's historical records and logs.  On or about February 23, 2018, Balaci discussed with Goettsche that BCN's "binary tree" was creating problems, and Balaci mentioned that "yeah, Mike sent me a few of those," which I understand to mean a few customer support tickets complaining about problems with the BCN binary.  Based on this investigation, Mike's involvement has continued throughout the scheme.

76. Financial institution records reviewed during the course of this investigation indicate that, throughout the scheme, BCN's operators, including Goettsche, have diverted significant amounts of investor funds for personal uses, including luxury travel and accommodations,

and not for the purchase of mining equipment or otherwise for the benefit of the purported mining pool.

77. In addition, blockchain analysis has revealed that much of the cryptocurrency accepted by BCN from BCN investors was transferred—often through concealing mechanisms like mixers, tumblers, and peel chains effectuated through numerous transactions without economic justification—to third-party wallets (including wallets controlled by the Subjects).

78. BCN has defrauded a significant number of investors around the world.  Law enforcement has reviewed the bitcoin wallets that they have been able to attribute to BCN investors.  A review of those wallets reveals that BCN has taken at least $722 million from investors in bitcoin since its inception.  BCN continues to operate to this day

79. Goettsche has profited from the BCN scheme.  Goettsche has placed his money in various accounts, properties, and entities, both domestically in the United States and abroad.  Goettsche also appears to have utilized law firms to repatriate profits from overseas accounts.  Goettsche also has made lavish purchases such as a property in Belize, a residence in Costa Rica, multiple properties in Colorado, a private jet, and luxury cars, and financed multiple business ventures.

80. Based on this investigation, Goettsche appears to have bank accounts or to have used bank accounts at a number of foreign banks and cryptocurrency exchanges, including Commerzbank, OSL, Bank of Nevis, Banco De Costa Rica, Atlantic Bank Ltd., Bitfinex, RBC Capital Markets, RBC Wealth Management, Binary Trading, Binary FZE, Trilix PTE, Lantau Peak Trading, and Sackville Bank and Trust.

81. There is further probable cause to believe that Goettsche has used several entities to open and maintain bank accounts that received and/or transferred funds including Getch Holdings LLC, Bitwealth Investments Inc., Getch Inc., Block Buzz Inc., Crypto Back Inc., MMD Holdings, LLC, Bit.Life LLC, GFT Management LLC, BMB Network LLC, Goettsche Family Trust, Amazing Partners, X Power Team LLC, Power Members LLC, GoBit LLC, Bitwealth Holdings , LV Life LLC, AZ Life LLC, MDBA Trust, MDBA Land Trust, Getch Bros LLC , Getch 2021 LLC, Orbesehc Industrial LLC, HIIT Health LLC, and Jersery Island.  The investigation further revealed that Goettsche received funds that originated from BCN from accounts maintained by Gavin Dickson - and Most Amazing Box LLC.

## THE SUBJECT PREMISES

82. Based on the information set forth in this Affidavit, I believe there is probable cause to believe that the operators of BCN, including Goettsche, have been and are continuing to engage in an unlawful investment fraud scheme.

83. The Subject Premises serves as Goettsche's primary residence and has since in or around August 2017.  Based on information obtained from the United States Postal Service, Goettsche has received mail at the Subject Premises as recently as November 20, 2019.

84. Moreover, surveillance of the Subject Premises conducted on or about November 17, 2019 revealed several vehicles matching the description of vehicles owned by Goettsche parked in the driveway and garage of the Subject Premises.

85. According to email communications between Goettsche and Amazon, Inc. ("Amazon"), Goettsche has made numerous purchases through Amazon which have been shipped to the Subject Premises as recently as February 2019.  Notably, Goettsche purchased a Lenovo desktop computer and a Dell XPS laptop through Amazon on or about December 6, 2017, during a time when BCN was operational.  Both items were shipped to the Subject Premises. As set forth previously, I know through this investigation that Goettsche and others effectuated this fraudulent investment scheme by using computers and other devices connected to the internet.  For example, BCN maintained a website to attract investors and Goettsche and others communicated frequently regarding the operation of BCN through email and other electronic means.

86. On or about December 12, 2017, Goettsche ordered two Satoshi Labs "safe wallets" for cryptocurrency storage.  I know from my training and experience that such devices allow a user to store various types of cryptocurrency, including bitcoin, securely without exposing the user's private keys.  I also know that such devices are capable of connecting to a computer through a USB cable and are used to make secure transactions in cryptocurrency. The cryptocurrency wallets were shipped to the Subject Premises in December 2017 at a time when BCN was operational and BCN was purportedly mining bitcoin.  I further know that individuals who store cryptocurrencies in a "safe wallet," such as the model ordered by Goettsche and shipped to the Subject Premises, will often store the devices in a secure place, such as a safe, and will rarely travel with such devices because of the risk of losing the stored information.

87. On or about September 17, 2018, Goettsche received an email from AT&T regarding the shipment of an iPhone XS to the Subject Premises.  The email referred to the item as "Matt's Apple iPhone XS – 512GB – Gold," and provided an estimated shipping date of September 21, 2018.  The order was shipped to "Matt Goettsche" at the Subject Premises.  According to information provided by Apple, several other Apple products are registered to Goettsche, included an Apple watch, several iPhones and iPads, and an Apple pencil.  Further, a March 2017 email between Goettsche and a Colorado based electrical contractor, addressed to Goettsche at the Subject Premises and regarding electrical and other work to be performed on the Subject Premises, referenced at least one Apple TV.

88. Based on this investigation, I know that Goettsche maintained numerous bank accounts, both foreign and domestic, in both his own name and in the names of various business and trusts associated with him.  I further know that Goettsche and other involved in this scheme

amassed large proceeds of the criminal scheme described above in various forms including both U.S. and foreign-based fiat currency as well as cryptocurrency.

89. Finally, based on my training, experience, and participation in this and many other fraud investigations, as well as my conversations with other agents and officers involved in this and other such investigations, I believe the following:

  A. Individuals involved in the Subject Offenses amass large cash proceeds from these activities, and that these individuals attempt to legitimize these proceeds.  I know that to accomplish these goals, these individuals utilize, among other things, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts;

  B. Individuals involved in the type of scheme described above must keep evidence of their schemes, such as contact information for their co-conspirators, lists of identities and accounts used in the scheme, simply to keep the scheme going.  These individuals often use the proceeds of their fraud to purchase expensive items, or keep the proceeds in the form of cash to make their crime harder to detect.

  C. More sophisticated criminals often store their illicit proceeds in digital currency or on prepaid credit cards, again to make the proceeds hard to trace.  Typically, they maintain all this evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles.

  D. Such individuals commonly maintain multiple cellular telephones to compartmentalize their contacts, and communicate with their fellow participants by phone, email, and text messages.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crimes under investigation

  E. Individuals who engage in offenses involving the mining, purchase, or transfer of cryptocurrency, including bitcoin, commonly maintain in their residences, businesses, and other secure locations, devices to store cryptocurrency.

## **CONCLUSION**

90. Based on the investigation described above, probable cause exists to believe that, at the residence located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of the Subject Offenses (described on Attachment B).

91. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ Roger Duh*_____
Roger Duh, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this 6th day of December, 2019

_____
UNITED STATES MAGISTRATE JUDGE

*Special Agent Duh attested to this application over the telephone pursuant to Rule 4.1(b)(2)(A) of the Federal Rules of Criminal Procedure.*

Application for search warrant was reviewed and is submitted by David Tonini, Assistant United States Attorney.